## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ZANE and LEAH HEDGER, | ) | |
| Individually, and as Parents and Next | ) | |
| of Kin of J.R.H., deceased and S.H., | ) | |
| a minor, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | NO.  CIV-13-0654-HE |
| | ) | |
| TRACI D. KRAMER, an individual, | ) | |
| *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This case arises out of the tragic death of J.R.H., the nine month old son of plaintiffs Zane and Leah Hedger.  In their second amended complaint, plaintiffs claim that J.R.H. sustained two severe skull fractures while he was in the care of defendant Traci Kramer, which resulted in his death. They allege that defendants Misty Leitch, an Edmond Police detective, and Julie Whitaker, an Oklahoma Department of Human Services ("DHS") caseworker, conducted a faulty investigation into the circumstances surrounding J.R.H.'s death.  They also allege that as a result of the unconstitutional conduct of Whitaker and Tamara Washington, her supervisor, S.H., their second child, was placed in temporary foster care and the district attorney instituted legal proceedings seeking to terminate their  parental rights to S.H.  Plaintiffs initially sued Kevin and Traci Kramer, Misty Leitch, Julie Whitaker, Tamara Washington, the City of Edmond and DHS.  Plaintiffs' claims against Kevin Kramer, Misty Leitch, the City of Edmond and DHS have been dismissed. *See* Doc Nos. [33, 62].

Plaintiffs assert a negligence/wrongful death claim against Traci Kramer, which is stayed due to her bankruptcy filing. *See* Doc. Nos. 89, 91. On their own behalf, plaintiffs assert substantive due process claims under the Fourteenth Amendment and malicious prosecution claims under § 1983 and state law against Whitaker and Washington. On behalf of S.H., they assert a Fourteenth Amendment substantive due process claim and a Fourth Amendment wrongful seizure claim against Whitaker and Washington.

Defendants have moved for summary judgment, which is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A genuine dispute as to a material fact 'exists when the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party.'" Carter v. Pathfinder Energy Servs., Inc., 662 F.3d 1134, 1141 (10th Cir. 2011) (quoting Zwygart v. Bd. of Cnty. Comm'rs, 483 F.3d 1086, 1090 (10th Cir.2007)).

Background[1]

On March 8, 2011, plaintiffs' infant son, J.R.H.. was transported to Baptist Hospital from the home of Traci Kramer, his babysitter. Kramer stated that when she went to get J.R.H. up from a nap at approximately 3:00 p.m. she found him unconscious and not breathing. He had been in her care since 7:50 a.m., when the Hedgers had dropped him off.[2] Detective Leitch was assigned to investigate the case on behalf of the Edmond Police

---

[1]*The facts are largely undisputed. To the extent a dispute exists, it is noted.*

[2]*The Hedger children were in day care four days a week.*

Department. She reported suspected physical abuse to the DHS Hotline and DHS child welfare specialist Whitaker was contacted and began her investigation. At that time, Whitaker had more than ten years experience as a social worker. Since 2010 she had been with the specialty unit in DHS that investigates child death, near death and sexual abuse in children 12 years and under. Whitaker met Detective Leitch at Baptist Hospital ("Baptist"), where they interviewed various people, including the Hedgers and Traci Kramer ("Kramer").

The emergency room physician on duty at Baptist informed Detective Leitch that J.R.H. had a skull fracture, but he was unable to determine if it was a new or old injury. Both the Hedgers and Traci Kramer denied knowledge as to how the skull fracture occurred. Leah Hedger told Detective Leitch and Whitaker that March 8 was J.R.H.'s first day back at the Kramer home because he had been sick the previous week with a respiratory virus (RSV).[3] She told them that a month and a half to two months previously, J.R.H., who was not mobile (he was not crawling), had been treated for a fractured arm/shoulder and, a few weeks before he had a "very large bruise on his head." Doc. #150-2, p. 16.[4] She said she had brought both of those injuries to the attention of defendant Kramer. *Id.* at pp. 18, 28. Again, both the Hedgers and Kramer denied any knowledge as to how those injuries occurred.

Later that evening, J.R.H. was transferred to University of Oklahoma Children's

---

[3]*Respiratory Synctial Virus.*

[4]*Plaintiffs dispute that the bruise was "large," noting that it was referred to as merely a "bruise" in the Report to the District Attorney which Whitaker later prepared. See Doc. #153, p. 8, ¶9; compare Doc. #150-1, p. 15 (Leah Hedger's reference to a "bruise"), with p. 16 (Zane Hedger's reference to a "two and a half" inch bruise). Regardless of its exact size, J.R.H.'s parents reported he had a notable bruise of unknown origin on his head two weeks before his death.*

Hospital ("Childrens").  Whitaker and Detective Leitch also went to Childrens to continue their investigation.  Both spoke with Dr. Christine Allen, the treating doctor, who confirmed that J.R.H. had suffered a skull fracture.  According to Detective Leitch, Dr. Allen stated they were unable to tell if it was a new or an older fracture.  Plaintiff has submitted evidence indicating Dr. Allen told Whitaker on March 8 that she believed the babysitter, rather than the Hedgers, injured J.R.H.

Detective Leitch  and Whitaker jointly decided that S.H. should be immediately placed in protective custody while the investigation continued.  Oklahoma law allows a police office to take a child into custody without court order if the officer has "reasonable suspicion" that the child is in need of protection due to an imminent safety threat.  10A Okla. Stat. § 1-4-201(A)(1).[5]  The rationale for their decision, as explained by Detective Leitch, was because she had spoken with the Hedgers and Kramer and "they disclosed that a nine-month-old child who was not mobile, who was not moving, has had two previous injuries that were not reported to law enforcement or DHS and is now in the hospital with

_____

[5]*The statute provides that prior to the filing of a petition, a child may be taken into custody:*
*1. By a peace officer or employee of the court, without a court order if the officer or employee has reasonable suspicion that:*
*a. the child is in need of immediate protection due to an imminent safety threat,*
*b. the circumstances or surroundings of the child are such that continuation in the child's home or in the care or custody of the parent, legal guardian, or custodian would present an imminent safety threat to the child, or*
*c. the child, including a child with a disability, is unable to communicate effectively about abuse, neglect or other safety threat or is in a vulnerable position due to the inability to communicate effectively and the child is in need of immediate protection due to an imminent safety threat.*
*10A Okla. Stat.  § 1-4-201(A)(1).*

4

a skull fracture." Doc. #150-2, p. 28. When asked why the Kramers' children were not taken into protective custody, the detective stated: "because of the fact that the Hedgers disclosed that they are the ones who brought the attention of the injuries to Ms. Kramer. Ms. Kramer did not bring attention to the injuries to them. And also her children are older. The Kramers' children are old – school aged -- older, school aged children that could tell somebody if they needed help or if something was wrong." *Id.*

The Hedgers were notified that S.H. was being taken into protective custody and that an emergency hearing would occur the following day. In accordance with 10A Okla. Stat § 1-4-201(1)(A),[6] Edmond law enforcement picked up S.H. and he spent the night in a shelter.

On March 9, 2011, an Oklahoma County Assistant District Attorney (D.A.) filed an application to take S.H. into emergency custody. State law requires that the application "state facts sufficient to demonstrate to the court that a continuation of the child in the home or with the caretaker of the child is contrary to the child's welfare and there is reasonable suspicion that" the child is in need of protection due to an imminent safety threat. 10A Okla. Stat. § 1-4-201(A)(2). The D.A. submitted defendant Whitaker's affidavit in support of the application.

In her affidavit Whitaker included the following information which she and Detective Leitch had gathered:

---

[6] *Although plaintiffs denied that S.H. was picked up in accordance with the provisions of the statute, they failed to explain how defendants did not comply with it.*

5

> Mr. and Mrs. Hedger have two children, J.R.H., 9 months, and S.H., 5 years. J.R.H. was found not breathing by his daycare provider, Traci Kramer, at 3 p.m. on March 8, when she checked on him during a nap. He had been dropped off there at 7:50 a.m. that morning. He was taken to Baptist Hospital where it was learned he has a skull fracture and pneumonia (his recent treatment for RSV was noted). His parents and babysitter reported prior injuries – an arm/shoulder fracture approximately two months prior and a two and a half to three inch bruise on the back of his head two weeks prior, but all denied knowing their causes. J.R.H. has a 5 year old sibling and his parents, Mr. and Mrs. Hedger have no previous child welfare or criminal history. "Dr. Christine Allen reported [J.R.H] did not have a lot of bruises, but there was a bruise around his penis at the base; but, it is unknown if that was a scratch or blood from the foley, and Jacob has a poor prognosis. She reported a CHO-25 would be filed."

Doc. #150-8, p. 3.[7] Whitaker did not mention Dr. Allen's statement that she did not think the Hedgers caused J.R.H's injuries or include a statement by Amy Baum, a social worker at Childrens, that neither she nor Dr. Stuemky, another Children's physician, thought the Hedgers caused J.R.H.'s skull fractures. However, the discussion between Whitaker and Baum, during which the statement was made, occurred at approximately 2:30 p.m. on March 9. *See* Doc. #157-1, p. 7. It is questionable, therefore, whether it took place before Whitaker's affidavit was submitted with the D.A.'s application on March 9, 2016.[8]

As a result of the application, an emergency custody order was entered on March 9, directing that both J.R.H. and S.H. be taken into custody. The same day an emergency placement hearing occurred and S.H. was placed in kinship foster care with his aunt, Zane

---

[7]*A CHO-25 is the hospital's reporting form for suspected child abuse and neglect.*

[8]*Defendants assert in their reply brief that "[t]here is no evidence as to whether Whitaker was even aware of Dr. Stuemky's opinion at the time the affidavit was prepared." Doc. #150, pp. 2-3.*

Hedger's sister, with whom he had a close relationship.

At approximately 5 p.m. on March 9, J.R.H. died. On March 10, a show cause hearing was held before a referee in the Juvenile Division of the District Court of Oklahoma County. Plaintiffs appeared and were represented by counsel. Ms. Whitaker testified, recommending that S.H. be placed in DHS custody.

During the hearing Whitaker was asked twice whether Dr. Allen had given her an opinion or indicated to her when, given the nature and extent of the skull fracture, [J.R.H.] would become symptomatic. Doc. #154-4, pp. 9,11. Both times she responded no, stating the age of the skull fracture was unknown. She said the autopsy might determine the age of the skull fracture. Whitaker stated, when asked whether she had any reason to believe that the parents had anything to do with the skull fracture, that the perpetrator of the injury was unknown. She was asked whether Dr. Allen had given "any thoughts, medical thoughts," on the fracture having occurred while the baby was at the Kramer's "because of the nature and extent of the fracture." *Id.* at p. 14. Whitaker responded "it is possible, but it is not ruled out as the only possibility." *Id.* She then was asked whether Dr. Allen had given her "a medical opinion, within a reasonable degree of probability, My thinking is that fracture happened between 8:00 and 3:00"?" *Id.* Whitaker responded" "she did not say that definitively, sir." And in response to the follow up question, whether Dr. Allen had indicated to her "in any way that she had a concern with the parents, " Whitaker stated: "[s]he has a concern – she – she indicated she would be filing a CHO-25 suspecting child abuse and

neglect." *Id.* [9]

Whitaker also testified during the hearing that S.H. wanted to be returned to his parents, had not expressed any fear of them and had said he felt unsafe at his babysitters. She stated that she felt as though both parents "shared the utmost concern for the well-being" of both children. *Id.* at p. 19.

At the conclusion of the hearing the Referee concluded that "the pick-up of the child [was] lawful" and that "DHS custody [was] warranted." Doc. #150-4, p. 32. He entered an order finding reasonable suspicion existed that S.H. was in need of immediate protection due to abuse or neglect.

Ms. Whitaker completed her Report to the District Attorney on March 15, 2011, which Washington reviewed and approved on the same date. Ms. Whitaker included the information relayed to her by Amy Baum, but not any statement as to who Dr. Allen believed was responsible for J.R.H.'s injuries. Whitaker recommended that the Oklahoma County District Attorney ("D.A.") file a deprived child action on behalf of S.H. "to ensure his health, safety, and welfare at this time." Doc. #150-1, p. 3. The D.A. filed a deprived child petition on March 17, 2011. Whitaker completed an Addendum Report to the D.A. dated June 27, 2011, but had no further involvement in court proceedings related to S.H.

By court order, S.H. was returned to his parents' care on May 17, 2011. The

---

[9]*Whitaker responded "No," when asked whether anyone she had interviewed indicated where they believed J.R.H was at the time of any of the injuries – the skull fracture, the "arm issue," the "three-inch bruise"– he had sustained. Doc. #150-4, p. 29.*

Permancy/Review Order stated that "DHS, CASA, Pathways, D.A. & Child's Atty agree that child should be returned home. All medical evidence indicates that child died at babysitters and that parents were not responsible." Doc. #157-5, p. 3. The state court dismissed the deprived child action on July 26, 2011, by agreement of all parties – CASA, DHA, the D.A. and the child's attorney. Doc. #157-6, p. 3.

Charges related to J.R.H's death have never been filed. Although plaintiffs assert that "[a]ll the medical evidence . . . is that J.R.H. was killed in Traci Kramer's house," Doc. #153, ¶32, there is evidence of a disagreement as to "the time and cause of death." *See* Doc. Nos 150-3, p. 25;[10] 150-2, pp. 43-44; Doc. No. 150-11, p. 3. The Addendum Summary filed by Whitaker reflects the disagreement. Dr. Choi, the medical examiner, took the position that she could not "definitively state that [J.R.H] had no evidence of older abusive head trauma injuries," while Dr. Stuemky, the director of Children's Child Protection Team, stated that "if [J.R.H.] presented to the Kramer household functioning as a normal child, i.e. eating, drinking, and playing, then the injuries that led to [his] death would have had to have occurred in the Kramer household ." Doc. #150-13, p. 3.[11] During the time S.H. was away from his home, plaintiffs were able to visit him each day, and plaintiffs acknowledge that his

---

[10]*In support of their position, plaintiffs have submitted the reports of three clinicians and a social worker. Doc Nos. 94-3 - 94-7. Because defendants have objected to them on the ground they are not sworn or otherwise authenticated, the reports may not be considered as evidence in support of plaintiffs' claims.*

[11]*Detective Leitch also testified that "there was not enough evidence to -- charge any one person due to the fact that the child was in the hands of so many care givers." Doc. #150-2, p. 26. Another individual, Tina MacArthur, apparently also watched J.R.H. Id.*

placement with his aunt did not change his relationship with his family.

## Analysis

With respect to plaintiffs' § 1983 claims, defendants rely on the defense of qualified immunity. "A plaintiff may only overcome a government official's immunity by showing 'first, that the official violated the plaintiff's federal statutory or constitutional rights, and, second, that the rights in question were clearly established at the time of their alleged violation.'" Estate of B.I.C. v. Gillen, 710 F.3d 1168, 1173 (10th Cir. 2013) (quoting Lewis v. Tripp, 604 F.3d 1221, 1225 (10th Cir. 2010). Defendants focus largely, if not exclusively, on the first step of the analysis, asserting that plaintiffs cannot demonstrate that defendants violated either their or S.H.'s rights under the Fourteenth or Fourth Amendments.[12]

Before discussing plaintiffs individual claims, the court notes that they are principally, if not exclusively, based on defendant Whitaker's alleged omission of Dr. Allen's "exculpatory" statement from the materials she prepared – the affidavit and Report to the D.A. – and the testimony she gave, in connection with the investigation surrounding the death of J.R.H. As will be discussed, there are several problems with plaintiffs' claims. However, there is an overriding problem. Plaintiffs' arguments fail to acknowledge that Whitaker was investigating both potential parental abuse and a failure to protect J.R.H. from abuse. Even if it were shown that plaintiffs were not the abusers and did not cause J.R.H's skull fractures, the undisputed evidence is that Whitaker was concerned that they had failed

---

[12]*The court therefore does not address the second step.*

to protect J.R.H. from the person or persons who had inflicted not just the most recent injury, but also those J.R.H had sustained within the preceding two months. That affects the significance of the physician's statement though, as will be discussed, Whitaker included a remark similar to Dr. Allen's in her Report to the D.A. and did discuss her statement to some extent in her testimony.

The court also notes that plaintiffs seek to hold defendant Washington liable principally due to her alleged acquiescence in Whitaker's alleged withholding of information. *See* Doc. #153, p. 15. Because the court concludes plaintiffs have failed to show that defendant Whitaker violated plaintiffs and S.H.'s constitutional rights, it is unnecessary to not make any further determination as to whether plaintiffs have demonstrated sufficient personal involvement by Washington for her to be liable under § 1983. *See* <u>Schneider v. City of Grand Junction Police Dep't</u>, 717 F.3d 760, 767 (10th Cir. 2013). To the extent plaintiffs assert defendant Washington failed to perform her job adequately, they have submitted no evidence to substantiate their allegation. The court's discussion, like the parties, will focus on the actions of Whitaker.

<u>Interference with Right to Familial Association – Fourteenth Amendment</u>

The right to familial association has long been recognized as a "subset" of the freedom of intimate association. <u>Griffin v. Strong</u>, 983 F.2d. 1544, 1547 (10th Cir. 1993). It is based on the "'concept of liberty in the Fourteenth Amendment,'" and grounded in substantive due

process.[13]  *Id.* (quoting Mayo v. Lane, 867 F.2d 374, 375 (7th Cir.1989). "The government's 'forced separation of parent from child, even for a short time, represents a serious impingement' on a parent's right to familial association." Thomas v. Kaven, 765 F.3d 1183, 1195 (10th Cir. 2014) (quoting Jensen, 603 F.3d at 1199), and likewise impinges on the child's constitutionally protected liberty interest in his relationship with his parents. *See* Lowery v. Cty. of Riley, 522 F.3d 1086, 1092 (10th Cir. 2008). However, the right is not absolute, "but must be weighed against the state's interest in protecting a child's health and safety in order to determine whether state actors unduly burdened that right in a given case." Thomas, 765 F.3d at 1196.

To establish their claim for deprivation of the right of familial association, plaintiffs must prove that (1) defendants intended to deprived them of their protected relationship with their son (or deprive S.H. of his relationship with his parents) and that (2) balancing their interest in their protected relationship with S.H. (or S.H.'s interest in his protected relationship with them) "against the state's interests in [S.H.'s] health and safety, defendants either unduly burdened plaintiffs [or S.H.'s] protected relationship, or effected an unwarranted intrusion into that relationship." *Id.* (internal citations and quotation marks

---

[13]*It is unclear to what extent, if any, the "shock the conscience standard" that normally applies to substantive due process claims, see Ruiz v. McDonnell, 299 F.3d 1173, 1183 (10th Cir. 2002) is applicable in cases involving the substantive due process protections of familial integrity. Compare J.B. v. Washington Cty., 127 F.3d 919, 927-28 (10th Cir.1997) (no mention of the standard) with Griffin v. Strong, 983 F.2d 1544, 1548-49 (10th Cir. 1993) (no evidence that conduct relating to plaintiff's familial right of association claim shocked the conscience) and Silvan W. v. Briggs, 309 Fed. Appx. 216, 223 (10th Cir. 2009) (rejecting plaintiffs' claim that minor's removal shocked the conscience, "[t]o the extent this contention can stand on its own, apart from the asserted violation of familial-association rights.").*

omitted).  The court considers, among other things, in conducting this balance, "the severity of the infringement on the protected relationship, the need for defendants' conduct, and possible alternative courses of action."  *Id.*

As evidence of defendants' intent to interfere with their protected relationship, plaintiffs point to defendant Whitaker's failure, under Washington's supervision, to disclose Dr. Allen's belief that J.R.H. suffered fatal injuries at Traci Kramer's home in her March 9 affidavit, in her Report to the D.A., and in her testimony during the Show Cause hearing.[14] They also cite her failure to disclose Dr. Stuemky's opinion in her affidavit.[15]  Plaintiffs claim that defendants' alleged failure to "present any evidence to support their recently discovered benevolent intent" in protecting S.H., Doc.#153, p. 18, demonstrates the second prong of the familial-association test.

Defendants respond that plaintiffs have not shown that Whitaker intentionally omitted Dr. Allen's belief from the Report to the D.A. to harm them.  In light of her inclusion of Amy Baum's statement, they contend Dr. Allen's opinion would have been cumulative.  As for what Whitaker said  at the Show Cause Hearing, defendants claim plaintiffs simply ignore

---

[14]*Plaintiffs also assert that defendants did not adequately investigate the grounds for removal, but do not develop their argument or offer any evidence demonstrating that defendants' alleged inactions amounted to anything more than negligence, which is not enough to establish a § 1983 claim.  The only specific deficiency cited is Whitaker's failure to interview Dr. Stuemky.  She did, though, include Amy Baum's statement that neither she nor Dr. Stuemky believed that the Hedgers were responsible for the injuries to J.R.H. in her Report to the D.A.*

[15]*As noted earlier, it appears unlikely that Whitaker had spoken with Amy Baum at the time she prepared her affidavit.  Regardless, as is discussed infra, inclusion of the statement would not vitiated the reasonable suspicion required to remove S.H. from plaintiffs' custody.*

critical parts of her testimony. They assert that, while plaintiffs may take issue with the words Whitaker used, she did discuss what she learned from Dr. Allen.

Defendants also argue that, although plaintiffs focus solely on the cause and timing of J.R.H.'s skull fractures, the decision to remove S.H. was based on multiple factors. They contend that Detective Leitch and Whitaker considered, in addition to the skull fractures, J.R.H.'s other unexplained injuries, plus S.H.'s age, and reasonably concluded there was a threat of harm to S.H. due either to parental abuse or a failure to protect. They claim plaintiffs have not offered any evidence of the intent required to establish their substantive due process claim or presented any facts showing that, under the circumstances, their familial associational rights were unduly burdened.

The court agrees with defendants that plaintiffs have not raised a genuine issue of material fact as to defendant Whitaker's intent. Missing from the record is evidence from which a reasonable juror could conclude that, rather than performing the task assigned to her, which was to investigate whether the Hedgers had physically abused or failed to protect J.R.H. from physical abuse,[16] Whitaker's actions were intentionally "directed at the [familial] relationship itself." Trujillo v. Bd. of Cnty. Comm'rs of Santa Fe Cnty., 768 F.2d 1186, 1190 n.6 (10th Cir. 1985).[17] In other words, while her actions would have the effect of interfering

---

[16]See Doc. #150-1, p.2 (Referral alleges physical abuse and failure to protect [J.R.H.] . . . ").

[17]The intent element is particularly difficult in this type of case because, due to the job Whitaker performed,, regardless of her subjective intent, Whitaker's actions would directly impact the familial relationship. Compare Cordova v. City of Albuquerque, 816 F.3d w645, 654-56 (10th Cir. 2016) with Turner-Burgess v. City of Oklahoma City, 2011 WL 4588889, at *12 (W.D. Okla. Sept. 30, 2011).

with the familial relationship, plaintiffs have not offered evidence suggesting some motivation for her conduct beyond responding to what her investigation revealed and what her job necessarily entailed.  *See* J.B. v. Washington County, 127 F.3d 919, 927-28 (10th Cir.1997) (Plaintiffs "do not allege that the officials were motivated by any other purpose apart from investigation.").

Plaintiffs claim that Whitaker's repeated omission of what they refer to as "Dr. Allen's exculpatory opinion," Doc. #153, p. 18, "gives rise to an inference that defendants Whitaker and Washington acted with the requisite intent required to support [their] § 1983 claim for interference with their familial right of association." *Id.*  If plaintiffs had provided evidence that Dr. Allen had given Whitaker a definitive or even a reasoned medical opinion which Whitaker then ignored or, if Whitaker had completely failed to acknowledge that both Dr. Allen and Stuemky had stated their belief that the Hedgers were not responsible for the injuries to J.R.H., plaintiffs' argument might be persuasive.  A juror then might be able to conclude that Whitaker was direct[ing] . . . her statements or conduct at the intimate relationship with knowledge that the statements or conduct [would] adversely affect that relationship." Griffin, 983 F.2d at 1549.  However, the only evidence as to what Dr. Allen told Whitaker consists of Whitaker's own somewhat tentative testimony.  There is no deposition testimony affidavit, or any admissible statement from Dr. Allen as to what she told Whitaker.  Whitaker stated: "If I remember correctly, she communicated that she didn't think the parents would have done this to the baby." Doc. 157-1, p. 2.  It is unknown what else, if anything, Dr. Allen said to Whitaker the evening of March 8.  Detective Leitch testified

15

that neither Dr. Allen nor Dr. Stuemky ever told her that they did not believe the parents had injured J.R.H. Doc. #150-2, pp. 21, 33. Dr. Allen's lone statement, even if included in the affidavit or Report to the D.A. would not have eliminated the reasonable suspicion of an imminent safety threat, as the removal was based not just on the skull fractures that J.R.H. had sustained and not just on suspected abuse, but on the other, recent unexplained injuries and on a suspected failure to protect.[18]

Whitaker did include the fact that Amy Baum and Dr. Stuemky did not believe the Hedgers had harmed J.R.H. in her Report to the D.A.[19] and she testified at the hearing[20] that Dr. Allen had stated that the injuries could have occurred between the time J.R.H. was dropped off at the Kramer's and the 911 call was made. Her Report to the D.A. could have been more thorough and her hearing testimony clearer. Regardless, the record before the court does not support a reasonable inference of wrongful, intentional conduct such as is required to support a §1983 violation. Griffin supports this conclusion. There the Tenth

---

[18]*The court has included the omitted information and then considered whether the modified affidavit establishes the reasonable suspicion of an imminent safety threat required to take S.H. into custody. See Puller v. Baca, 781 F.3d 1190, 1197 (10th Cir. 2015). Reasonable suspicion is a lesser standard than probable cause. See id. at 1200 (to meet probable cause standard, "affidavit needed only to establish something more than a bare suspicion that [plaintiff in §1983 action] committed a bias-motivated crime") (internal quotation marks omitted)..*

[19]*The information plaintiffs claim she withheld that was provided by Dr. Allen was essentially the same as what she was told by Ms. Baum.*

[20]*Whitaker is entitled to absolute immunity from civil liability based on the testimony she provided during the hearing. PJ ex rel. Jensen v. Wagner, 603 F.3d 1182, 1196 (10th Cir. 2010) ("A witness is absolutely immune from civil liability based on any testimony the witness provides during a judicial proceeding 'even if the witness knew the statements were false and made them with malice.'") (quoting Briscoe v. LaHue, 460 U.S. 325, 332 (1983)).*

Circuit determined that, even though the police office had lied to Dorothy Griffin, the accused's wife, telling her that her husband had confessed to child abuse (he did later confess to abusing several young girls), "there [was] no evidence or allegation that the conduct going to Dorothy Griffin's familial rights of association claims involved physical coercion or conduct that shocks the conscience." Griffin, 983 F.2d at 1548-49; Turner-Burgess v. City of Oklahoma City, 2011 WL 4588889, at *12 (W.D. Okla. Sept. 30, 2011) ("There is no evidence that she intentionally sought to wrongfully interfere with the familial rights of Ms. Turner–Burgess or H.M.T. beyond the interference that necessarily results from an investigation of child possible molestation.").

Even if the court were to conclude that plaintiffs have submitted evidence sufficient to create a justiciable question as to the first element of the familial-association test, they have not done so as to the second. That element requires balancing plaintiffs' and S.H.'s interest in their protected relationship with each other against the State's interest in S.H.'s health and safety, to determine whether defendants either unduly burdened plaintiffs' and S.H.'s protected relationship or effected an unwarranted intrusion into it. Thomas, 765 F.3d at 1196.

Plaintiffs claim defendants fail to demonstrate a significant interest in protecting S.H.'s life. However, it is the state's interest that must be considered and weighed in determining whether a person's familial association rights have been violated, not Whitaker's. And the State of Oklahoma has both a significant interest in protecting and safeguarding S.H.'s life, PJ ex rel. Jensen v. Wagner, 603 F.3d 1182, 1199 (10th Cir. 2010),

and a well recognized, substantial interest "in investigating cases of alleged child abuse." Griffin, 983 F.2d at 1548. These important interests are weighed against the plaintiffs' and S.H.'s interests in associating with each other, which are "unquestionably of paramount importance." Jensen, 603 F.3d at 1199.

Defendants have shown that, based on the evidence Whitaker and Detective Leitch accumulated during their investigation, they had "a reasonable suspicion of past and impending harm" to J.R.H., Silvan W. v. Briggs, 309 Fed. Appx. 216, 223 (10th Cir. 2009), and of imminent harm to S.H. that warranted his removal. The evidence is undisputed that J.R.H. had other, prior injuries that were cause for concern. As defendants note, the detective and Whitaker did not recommend that S.H. be removed solely because of the skull fracture that caused J.R.H.'s death. When or where J.R.H. was fatally injured was just one of several factors being considered by Whitaker and Detective Leitch along with their knowledge that the infant had sustained additional, recent, unexplained injuries. Their stated concern was whether there was "a pattern of behavior that would suggest that the parents continued to put their children in situations that [were] potentially neglectful or harmful." Doc. #157-7, p. 6; 150-3, p. 21. They were looking at both possible physical abuse and a failure to protect.

Other than leaving S.H. in place, there was no alternative course of action. The resulting infringement was significant, as S.H. was separated from his parents for two months. *See* Thomas, 765 F.3d at 1195. The impact was lessened, though, by the child's placement with a close relative and the parents' ability to see the child daily which, they admitted, allowed the familial relationship to remain unaffected.

18

In applying the balancing test, the court heeds the Tenth Circuit's admonition that "considerable deference should be given to the judgment of responsible government officials in acting to protect children from perceived imminent danger or abuse." J.B., 127 F.3d at 925 (internal quotation marks omitted). Although a close question, the court concludes no reasonable juror, if asked to balance the interests on the record the court has before it, could determine that plaintiffs' associational rights outweighed the state's interest, under the circumstances presented here, in protecting S.H. from the risk of harm. See Cordova v. City of Albuquerque, 816 F.3d 645, 656 (10th Cir. 2016) (defendants' explanation for its interference with the familial relationship, which plaintiff failed to refute with "any facts or theories that would allow a jury to find" it was pretextual, "show[ed] the defendants' actions were not directed at the familial relationship") J.B., 127 F.3d at 927-28; Silvan, 309 Fed. Appx. at 223 (child's removal and placement with aunt and uncle for a week did not unduly burden plaintiffs' familial association rights, where there was "ample evidence to raise a reasonable and articuable suspicion that [minor] had been abused and was in imminent peril of further abuse" due to parents' failure to protect). The court realizes that in many of the cases in which courts have determined that government officials did not impermissibly interfere with the plaintiffs' right of familial association, the parent-child separation was brief. However, the weighing in this case is affected by the fact that a sibling of the child who was separated from his parents died under circumstances that may have been a homicide.

Due to plaintiffs' failure to demonstrate a material question of fact as to whether

defendants violated their or S.H.'s constitutional right of familial association, summary judgment will be granted in defendants' favor on plaintiffs' and S.H.'s familial association claim. This decision finds support in the policies underlying the qualified immunity doctrine. Gomes v. Wood, 451 F.3d 1122, 1137-38 (10th Cir. 2006). The Tenth Circuit stated in Gomes that "as we have noted in discussing the grounds supporting the reasonable suspicion standard, [s]ocial workers face extreme difficulties in trying simultaneously to help preserve families and to serve the child's best interests. When confronted with evidence of child abuse, they may be required to make on-the-spot judgments on the basis of limited and often conflicting information, with limited resources to assist them." *Id*. at 1138 (internal quotation marks omitted).

Wrongful Seizure – Fourth Amendment

Plaintiffs claim that S.H. was wrongfully seized in violation of his Fourth Amendment rights. In response to defendants' motion, plaintiffs assert that government employees can commit constitutional violations "by withholding exculpatory evidence in connection with proceedings that can result in the deprivation of liberty interests and the initiation of lawsuits." Doc. #153, p. 19. Quoting Zamora v. City of Belen, 383 F. Supp. 2d 1315, 1330 (D.N.M. 2005), they contend that "[u]nder 42 U.S.C. § 1983, a law enforcement officer may violate the Fourth Amendment if he or she knowingly or recklessly omits information from an arrest affidavit which, if included, would have vitiated probable cause."

Based on this argument, the court assumes plaintiffs' contention is that Whitaker violated S.H.'s Fourth Amendment rights by omitting Dr. Allen's opinion from her affidavit

submitted in support of the D.A.'s application to take S.H. into emergency custody.[21]  As discussed previously, the court concludes, after having applied the <u>Wolford</u> procedure,[22] that the inclusion of Dr. Allen's statement that she did not think the parents had caused the most recent injury to the baby, and Amy Baum's similar statement, would not have eliminated a reasonable suspicion of imminent harm to S.H..  That is because the decision to remove S.H. was not based solely on the skull fractures or concern that the Hedgers were physically abusing J.R.H. and S.H., but on other, unexplained injuries to J.R.H. and a concern about the parents' failure to protect the children.  *See* Doc. #150-4, pp. 28-29.

Because plaintiffs have not created a material fact question as to whether S.H. was seized in violation of his Fourth Amendment rights, defendants are entitled to summary judgment on his Fourth Amendment claim.

<u>Malicious Prosecution – Fourth Amendment and State Law</u>

Plaintiffs have asserted malicious prosecution claims under § 1983 and state law against defendants premised on the deprived child action initiated against them by the D.A. Relying on <u>Pierce v. Gilchrist</u>, 359 F.3d 1279 (10th Cir.2004), they assert that if defendants had "conducted a complete investigation and made full disclosure of what they did know, there would have been no probable cause to remove S.H. from plaintiffs' home and no probable cause to institute proceedings to terminate plaintiffs' parental rights."  Doc. #153,

---

[21]*To the extent there were other grounds for S.H.'s Fourth Amendment claim, the court considers them waived due to plaintiffs' failure to assert or develop any additional arguments in their brief.*

[22]<u>*Wolford v. Lasater*</u>*, 78 F.3d 484 (10th Cir. 1996)*

p. 21.  Defendants argue that the claim fails because the D.A., rather than Whitaker or Washington, initiated the deprived child against plaintiffs, because probable cause existed for the action and because there is no evidence of malice.

As plaintiffs correctly point out in their response, defendants are not insulated from liability simply because they were not the official who decided to initiate or who had the authority to initiate the deprived child action.  The Tenth Circuit held in <u>Pierce</u> that a forensic analyst who "prevaricates and distorts evidence" to "induce prosecutors to initiate an unwarranted prosecution" may be held liable for the constitutional tort of malicious prosecution.  <u>Pierce</u>, 359 F.3d at 1293, 1296.  Nonetheless, plaintiffs cannot prevail here on their malicious prosecution claims because of a lack of evidence of malice.  *See* <u>Cordova</u>, 816 F.3d at 650 ("To prevail on a §1983 malicious-prosecution claim, a plaintiff must show: (1) the defendant caused the plaintiff's confinement or prosecution; (2) the original action terminated in the plaintiff's favor; (3) there was no probable cause to confine or prosecute the plaintiff; (4) malice; and (5) damages.");[23] <u>Young v. First State Bank,</u> 628 P.2d 707, 709 (Okla. 1981) (malice is one of five elements plaintiff must prove to establish malicious prosecution claim).  Not only did plaintiffs not respond to defendants' argument in their summary judgment motion, thereby waiving it, plaintiffs did not produce any evidence from which a reasonable juror could find the defendants acted with malicious intent.  *See* <u>Hornady</u>

_____

[23] *"Although the common law tort serves as an important guidepost for defining the constitutional cause of action, the ultimate question is always whether the plaintiff has alleged a constitutional violation."* <u>Pierce</u>, *359 F.3d at 1289.*

Mfg. Co. v. Doubletap, Inc., 746 F.3d 995, 1001 (10th Cir. 2014) ("[S]ummary judgment may be granted if the movant points out a lack of evidence to support the claim and the nonmovant [who bears the burden of persuasion] cannot identify specific facts to the contrary."). Defendants therefore are entitled to summary judgment on plaintiffs' malicious prosecution claims.[24]

## Conclusion

As recognized by the Tenth Circuit, these are "difficult case[s], pitting the fundamental rights of parents and families—rights that are in Griffin 's terms, 'consonant with the right of privacy'—against the awesome responsibilities of a county to investigate child abuse, a most reprehensible and ever-increasing problem." J.B., 127 F.3d at 932 (quoting, Griffin, 983 F.3d at 1547. While it is possible, with hindsight, to suggest improvements in the manner in which this matter was handled, plaintiffs' submissions are insufficient to create a justiciable issue as to whether Whitaker and Washington violated plaintiffs' or S.H.'s constitutional rights.

Accordingly, as the court has concluded defendants are entitled to summary judgment on plaintiffs' and S.H.'s Fourteenth Amendment substantive due process claims, S.H.'s Fourth Amendment claim and plaintiffs' § 1983 and state law malicious prosecution claims, defendants' motion for summary judgment [Doc. #146] is **GRANTED**. Judgment will be entered when the case is concluded with respect to all claims and parties. *See* Fed.R.Civ.P.

---

[24]*Because of this determination it is unnecessary to consider defendants' remaining probable cause argument.*

54(b).

**IT IS SO ORDERED**.

Dated this 19th day of July, 2016.

JOE HEATON
CHIEF U.S. DISTRICT JUDGE